Elbert Steel Corporation v. Commissioner.
Elbert Steel Corp. v. Commissioner
Docket No. 4401.
United States Tax Court
1945 Tax Ct. Memo LEXIS 188; 4 T.C.M. (CCH) 537; T.C.M. (RIA) 45176; May 21, 1945
*188 Petitioner, at a time when it was experiencing serious operating losses, entered into an oral contract of employment with one Kitfield whereby it was agreed that if Kitfield would become petitioner's vice president in charge of sales and put the company on a profitable basis of operation, he could have the net profits resulting from the business. Held, under the facts and circumstances, a salary of $46,000 in a later profitable year was not excessive and was reasonable compensation for services rendered. Mahlon A. Freeman, Esq., 100 Broadway, New York 5, N. Y., for the petitioner. William F. Evans, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in income tax in the amount of $2,717.19 and in *189 declared value excess profits tax of $437 for the taxable year ended December 31, 1941. The sole question concerns the reasonableness of a salary in the amount of $46,000 paid by the petitioner to its vice president during the taxable year. Findings of Fact Petitioner, the Elbert Steel Corporation, was organized under the laws of New York. Its income and declared value excess profits tax return for the calendar year 1941 was filed with the collector for the second New York district. Petitioner is an agent for several steel companies and as such agent handles tool steel, bars, and rods. It operates within a definite territory and has exclusive rights to the sales made therein of the steel of its principal companies. It maintains a warehouse in New York, in which it keeps in inventory an average of about 200 tons of steel. In 1941 petitioner had outstanding capital stock in the stated amount of $236,500, represented by 2,365 shares having a par value $100of per share. The capital of petitioner was largely invested in a warehouse, warehouse equipment, office furniture and fixtures, and the inventory. Petitioner sold steel from its own warehouse supply and also sold for direct *190 shipment by the respective principals. Even though the petitioner did not make the sales, it received a commission on all steel of the various principals sold to the purchasers within its territory. Herbert Bertrand organized the petitioner corporation in 1936 and with the exception of a few shares held by his wife, he owned all of its capital stock and was its president and general manager. From 1936 to 1939 petitioner suffered losses each year. In 1939 its capital deficit amounted to approximately $51,000. Gross sales during 1939 amounted to approximately $21,000. Bertrand was a business acquaintance and a social friend of long standing of Edward B. Kitfield. Kitfield had been in the business of selling steel for many years and for more than 23 years had been employed by the Vanadium Alloy Steel Company. He possessed a knowledge of metallurgical engineering which is necessary to the proper direction of the highly technical business of dealing in tool steel. His total annual compensation from Vanadium as salesman in charge of the eastern district was $28,000 and such amount was received by him in 1938. A like sum had been received by Kitfield in each of the several years immediately *191 prior thereto. After 25 years of service with the Vanadium Company, it would have been possible for Kitfield to have retired at one-half of his salary. He had served approximately 23 1/2 years in 1939. For several years prior to 1939. Bertrand had been trying to induce Kitfield to join the petitioner company and make a success of the venture. In the latter part of 1939 he told Kitfield that if he would become the vice president in charge of sales of the petitioner company he could have complete control of the corporation's sales policies and that he could have everything the corporation earned if he would bring it out of the "red." Bertrand agreed that he would take no salary and that the corporation would pay no dividends. He further pointed out to Kitfield that he would be building up a business for the latter's children. The period during which Kitfield was to be entitled to all of the company's profits was not definitely set. Bertrand had decided to close out the business unless Kitfield joined the petitioner's staff. In November 1939 Kitfield accepted the proposition and went to work as vice president in charge of sales of petitioner. In 1940 the gross sales amounted to over *192 $200,000. From a drawing account Kitfield drew $12,000 during 1940. After deducting all expenses, including the $12,000 withdrawn by Kitfield, petitioner had a net profit of approximately $800. This latter sum was divided one-half to Kitfield and one-half among the other salesmen. In 1941 the gross sales amounted to $687,139.21, and the gross income was $107,642.60. After payment of $46,000 to Kitfield; payments in the aggregate of $12,660 to the other officials of the corporation; payment of other salaries and wages in the aggregate amount of $13,013.56; and payment of approximately $27,524.99 for other expenses and deductions, the sum of $8,444.05, representing the balance of that year's earnings, was applied in reduction of an aggregate sum of $16,843.42, which represented a loss carried over from prior years. The record does not disclose the gross sales in 1942, but the corporation paid Kitfield a total salary of $35,000 and paid out in dividends $5,900. Of the gross sales in 1941, in the amount of approximately $687,000, about $540,000 was attributable directly to Kitfield's sales and business contracts. He went among his acquaintances in the steel industry and personally *193 induced them to make purchases from the petitioner corporation. The corporation employed five other salesmen who were responsible for the sales over and above the $540,000 brought in by Kitfield. The warehouse sales during 1941 amounted to above sixty percent of the total sales. The remaining forty percent was attributable to orders placed with and shipped directly from the steel mills. The World War beginning on September 3, 1939, had an active effect upon the sales of steel. Government priorities in steel were put into effect in about August 1941. The demand for steel of the character handled by petitioner was strong for the years 1940, 1941, and 1942, but the business brought in by Kitfield represented new accounts which had never before purchased from the petitioner. In 1942 Bertrand died. He had told Kitfield that he would leave him stock in the petitioner corporation and after his death his widow gave Kitfield fifty-one percent of the outstanding stock of the company. The stock received by Kitfield consisted of 1,206.15 shares, worth at that time $65 per share, or a total of $78,399.75. In 1942 Kitfield became president of the corporation. For the year 1941 petitioner paid *194 out in salaries to its officers the following: E. V. Kitfield, vice president
$46,000
W. S. Rennie, treasurer
7,375
C. T. Torbush, secretary
5,285
Total
$58,660
In his notice of deficiency the respondent determined that the salary paid to Kitfield for his services as vice president was excessive in the amount of $21,000. Opinion ARUNDELL, Judge: We are concerned only with the question of whether the salary paid by the petitioner to its vice president Kitfield in the amount of $46,000 was reasonable compensation for the services rendered. The applicable statute is section 23(a)(1)(A) of the Internal Revenue Code. The officer whose salary is in question was not a stockholder of the corporation during the taxable year. Hence, the salary bears no relationship to stock ownership and may not be regarded as a distribution of earnings in disguise. The salary was not determined or set by the corporation at a time when it might reasonably have known what its net income for the year in question would be, nor was the arrangement such that Kitfield could have known just what his salary in the taxable year would amount to in the way of dollars *195 and cents. Nowhere in the evidence does it appear that Kitfield was in any way related to Bertrand or to any of the other corporate officials. It is obvious that there was an exceptionally large measure of personal services in petitioner's business, activity and the evidence clearly shows that the success of the enterprise was largely due to the business acumen and drive of Kitfield. The record does not indicate the amount of salary drawn by Bertrand prior to the time Kitfield came into the organization, but it appears that he drew no salary thereafter. In 1939 gross sales amounted to approximately $21,000, and at that time the corporation had a capital deficit of some $50,000. By 1941 the gross sales had risen to over $687,000 and the corporation, in addition to the payment of all costs and expenses, was able to apply more than $8,000 against losses aggregating approximately $16,000 carried over from prior years. In 1942 Kitfield received a salary of approximately $35,000 and in that year dividends amounting to $5,900 were paid. Upon the evidence it appears that Kitfield's employment by the corporation has resulted in the restoration of the corporation to an income tax paying *196 status. Kitfield had been drawing salary up to $28,000 per annum from his former employer. In addition to the salary, he had been building up a substantial retirement fund. While it may be argued that the subsequent gift of stock in the petitioner corporation recompenses him for the loss of the retirement annuity to which he would have been entitled had he remained in his former employment, we do not think the gift has any bearing whatsoever upon his annual worth to the petitioner corporation as represented by the annual salary paid. The contract of employment contemplated no fixed salary, but rather that he should have the net profits if he could bring the venture out of the "red." Under such circumstances he was destined to take the profitless with the profitable periods so long as the arrangement continued. His average annual compensation during the two years in which the arrangement was in effect amounted to $29,200. Thereafter, it appears that the arrangement was terminated by the death of Bertrand and the subsequent gift of the controlling interest in the corporation to Kitfield. However, during those years he was to have a free hand in making the company's sales policies and *197 the success or failure of the venture rested largely upon him. The respondent objects to the arrangement on the ground that the contract specified no termination date. It is argued that while such an arrangement may have been satisfactory to a sole stockholder, it was not at all a healthful situation in the realm of business. We are not particularly concerned with the contract as such, for the result which may be reached in the determination of the question before us is not bound by the terms of petitioner's contract with Kitfield. See Am-Plus Storage Battery Co. v. Commissioner, 35 Fed. (2d) 167. However, contracts of a similar nature have met with approval where a provision as to the profits going for compensation to the officers was limited as to time. See Austin v. United States, 28 Fed. (2d) 677. It is well settled that where a contract of employment does not specify a definite period of employment, the term of the contract is at will. Gulickson v. Seglin Construction Co., Inc., 273 N.Y.S. 908; Martin v. New York Life Insurance Co., 148 N. Y. 117, 42 N.E. 416. If the instant contract be construed as being one for the employment *198 of Kitfield for an operating year of the petitioner corporation, it could be terminated at the end of such period. If the employment was carried over into the next year the law would imply a contract for such additional period. Lonsdale v. J. A. Migle, Inc., 225 N.Y.S. 593. The compensation was agreed upon at a time when it was not known that the immediate future years would be influenced by war activities and the reasonableness of the arrangement must be viewed in the light of conditions and circumstances in existence when the agreement was reached. Austin v. United States, supra. Indeed, Treasury Regulations 103, section 19.23(a)-6 provides that the circumstances to be taken into consideration are those existing at the date when the contract was made, not those existing at the date when the contract is questioned. The regulations further provide that if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should *199 be allowed as a deduction even though in actual working out of contract it may prove to be greater than the amount which would ordinarily be paid. We have noted in our facts that the outbreak of the war had an effect upon the sales of steel and that the demand for steel of the character handled by petitioner was comparatively strong during the years 1940, 1941, and 1942. We take note of the fact that Government priorities on steel were put into effect in August 1941. It is to be observed, however, that the selling of tool steel is a highly technical business and requires the guidance and experience of one possessing metallurgical knowledge. It is not questioned that Kitfield was well qualified for his position. The evidence establishes that though demand was strong there had been throughout the period here considered a surplus of tool steel and that the petitioner's sales were resultant from strenuous sales efforts. Also, that the major portion of petitioner's sales was directly attributable to Kitfield's sales efforts in securing new customers. Upon a consideration of the character and degree of responsibility placed upon Kitfield by the petitioner corporation, the nature of the *200 tool steel business carried on by the firm, the competition to be met and overcome from a sales standpoint, Kitfields' background, training and ability in the light of his responsibility, the value of his services to the corporation, and all other factors, we conclude that the respondent erred in disallowing the salary in excess of $25,000 paid him by the petitioner corporation. Decision will be entered for the petitioner.